**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **A.T., INDIVIDUALLY and as PARENT AND NATURAL GUARDIAN OF O.T., a minor** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  17-4983** |
| | : | |
| **OLEY VALLEY SCHOOL DISTRICT** | : | |
| | : | |

<u>**MEMORANDUM**</u>

**SCHMEHL, J.  /s/ JLS**                                            **DECEMBER 7, 2021**

Plaintiffs brought this action alleging that Plaintiff O.T. was harassed and bullied while a student at Oley Valley High School ("OVHS") following her alleged rape by the older brother of a female friend and classmate. The harassment allegedly occurred periodically between November, 2015 until October 2016. Plaintiffs claim that as a result of the harassment and bullying, O.T. attempted suicide, had to be hospitalized in a psychiatric unit on three separate occasions, had to enroll in an out of district special placement facility and ultimately had to transfer to another school district in October, 2016. Plaintiffs claim that officials from Defendant Oley Valley School District ("OVSD") failed to take any action to stop the harassment and bullying despite being repeatedly informed of same by the Plaintiffs.

In Count I of their Amended Complaint, Plaintiffs assert a claim against the OVSD for violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq*. Count II asserts a claim for compensatory damages against the

OVSD for violation of Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132.[1]

Counts III through IX assert various state law claims against Ryan Kline, the alleged rapist and his parents, Michael Kline and Beth Stauffer Kline. The Plaintiffs have since settled their claims against the Klines, leaving the two counts against the OVSD. Presently before the Court is the OVSD's motion for summary judgment on Counts One and Two. For the reasons that follow, the motion is denied.

**STANDARD OF REVIEW**

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id. (citing Anderson, 477 U.S. at 248).

---

[1] **O.T.'s mother, A.T.,** filed a due process complaint on behalf of O.T., claiming that the OVSD committed various procedural violations of both the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 *et seq* and Section 504 of the RA consisting of failing to identify O.T. in a timely fashion during the period from December 14, 2015 to March 11, 2016, and by failing to provide O.T. with an appropriate program and placement and denying O.T. a free appropriate education ("FAPE") during the period from August 24, 2016 to October 13, 2016. The due process complaint was heard by Special Education Hearing Officer William Culleton, Esq. OVSD personnel testified under oath at the Due Process Hearing which took place over a four-day period. In his Due Process Hearing Decision of November 6, 2017, Officer Culleton found, no failure on the part of the OVSD to seek an evaluation of O.T. in a timely fashion but that the OVSD's placement of O.T. "in regular education starting in August 2016 was inappropriate." ECF 101-5 at p. 21. As a result, Officer Culleton ordered the OVSD "to provide O.T. with full days of compensatory education to remedy O.T.'s resultant loss of educational services." *Id*. The OVSD did not appeal the Special Education Hearing Officer's decision.

Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. See *Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**FACTS**

The following facts are either not in dispute or construed in the light most favorable to Plaintiff:

1. In the fall of 2015, O.T. was 15 years old and a sophomore at OVHS, which is part of the OVSD. She was a straight A student and her field hockey coach, Tiffany Cappellano, believed she could play Division I field hockey in college. Dep., A.T., pp. 141-142; Dep., Tiffany Cappellano, p. 81.

2. On November 7, 2015, O.T., along with some other underage friends from OVHS, including Sydney Gillingham and Ethan Lavrador, attended a sleepover party at the home of O.T.'s friend and schoolmate, Madison Kline ("Maddie"). Dep., O.T., p. 164; Dep., A.T., pp. 57-58; 66. Maddie's parents and older brother, Ryan, (25 years old) were also present in the Kline's home during the party.

3. At some point during the early hours of November 8, 2015, O.T., who was in her own words, intoxicated from alcohol she had consumed at the party, and Ryan had sexual relations. Dep., O.T., pp. 193-199; Dep., A.T., pp. 70, 99, 89-97. O.T. believes she was sexually assaulted and/or raped by Ryan.

4. Later that morning, O.T. texted her friend Sarah Gladieux to tell her that she just had sex with Ryan Kline. Dep., O.T., pp. 202-203; 365.

5. On November 11, 2015, O.T. texted Maddie about having done something "really horrible" at the sleepover party on November 7, 2015. Dep., O.T., pp. 215; 366-369.

6. Upon learning from a third person of O.T.'s sexual relationship with Ryan, Maddie texted O.T.: "You're lying, you're a psychopath. You're crazy. You're

a drunk. I don't ever want you to talk to me or any of my friends again. Like never speak to me. Never even look at me. Like, you know, I fucking hate you." Dep., O.T., p. 215; 366-369.

7. O.T. testified that from this point, Maddie pretended O.T. did not exist and O.T.'s life "fell apart." Dep. O.T., p. 214, 221.

8. O.T. testified that she cared about what Maddie thought because "anyone would have." Dep., O.T., p. 216.

9. O.T. testified that she agreed that it made sense that Maddie would not talk to her in order to protect her family. Dep., O.T., p. 224.

10. O.T. testified that between November 11 and November 13, 2015, none of her peers at OVHS would talk to her. Dep., O.T., p. 228.

11. On November 13, 2015, O.T. reported the sexual relationship to Tim Coldren, a physical education teacher at OVHS, who contacted Child Line. Dep., O.T., p. 233; Dep., A.T., p. 99.

12. The Pennsylvania State Police began an investigation into the allegations of sexual assault in conjunction with the local District Attorney's office.

13. O.T. testified that later on the evening of November 13, 2015, she ingested at least 50 Tylenol pills and was hospitalized at Lehigh Valley Hospital ("LVH") with an admission diagnosis of Acute Stress Reaction diagnosis and suicide attempt by substance overdose. Dep., O.T., p. 235; Dep., A.T., p. 104. She was transferred to and remained in the LVH psychiatric unit from November 16, 2015 until November 23, 2015. She was diagnosed with mood disorder. Pl. Ex. 1 (ECF 101-1.)

14. O.T. testified that she told the staff in the psychiatric unit at LVH that "bullying, intimidation and harassment" meant that "my best friend for a pretty long time, all of a sudden like someone who I really, really trusted tell[s] me that this was my fault; and I was going to get this guy in trouble; and that I shouldn't have said anything; and I shouldn't have even done it in the first place and it was my fault for getting drunk; I had Sydney Gillingham who would sometimes talk to me but if Maddie was around she would completely ignore me." Dep., O.T., at p. 237.

15. The discharge summary from LVH noted that the overdose was triggered by three of O.T.'s friends not believing her and by O.T. receiving the text message from Maddie calling O.T. a pathological liar and other derogatory statements. She was discharged with a prescription for psychotropic medication. *Id*.

16. Ms. Kelly Hunsberger, O.T.'s guidance counselor at OVHS at the time, testified that she shared the discharge summary with OVHS Principal Michael Stauffer, Assistant Principal Gary McManus and Director of Special Services Dawn Cambria. N.T., Due Process Hearing, K. Hunsberger, pp. 191-192.

17. A.T., O.T.'s Mother, testified that on Saturday evening, November 14, 2015, she received a call from Principal Stauffer who told A.T. that he was "aware of what had happened and that the school would support O.T. academically." Dep., A.T., pp. 122-123. A.T. also testified that Principal Stauffer gave no response when she connected the overdose to the events

at the Kline party on November 7, 2015 and to O.T.'s friends giving O.T. a
hard time. *Id*., pp. 123-124.

18. Coach Cappellano testified that she directed the making and distribution of
about 20 get-well cards by members of the OVHS Field Hockey team to
both Maddie (who was also claiming to be under stress) and to O.T. during
O.T.'s hospital admission but cancelled the distribution when Maddie
objected to receiving the cards. Coach Cappellano later distributed the
cards herself to O.T. at an indoor field hockey club in January, 2016. N.T.,
Due Process Hearing, T. Cappellano, p. 485. O.T. was upset that she did
not receive the cards in a timely manner (the "Get-Well Cards Incident").

19. Upon her discharge from LVH, O.T. entered a partial hospitalization
program at Adolescent Transitions.

20. O.T. did not return to class at OVHS until December 3, 2015, when she
attended for only half a day. Dep., A.T., p. 175.

21. O.T. testified that she could only attend for a half day because "I couldn't be
in school. My mental health was so poor and I was so—I felt so like unsafe
at school. I couldn't—I couldn't do it." Dep. O.T., p. 249.

22. During the applicable time period, OVSD's Policy No. 248 addressed its
Title IX procedure related to unlawful harassment. Pl. Ex. 8 (ECF 101-8.)
Policy No. 248 includes, inter alia, the following provisions: "complaints of
harassment shall be investigated promptly, and corrective action taken
when allegations are verified." It notes that "[n]o reprisals nor retaliation
shall occur as a result of good faith charges of harassment," and defines

"harassment" as "verbal, written, graphic or physical conduct relating to an individual's race, color, national origin/ethnicity, sex, age, disability, sexual orientation or religion" only if that conduct has certain effects or "[i]s sufficiently severe, persistent or pervasive that it affects an individual's ability to participate in or benefit from an educational program or activity or creates an intimidating, threatening or abusive educational environment." *Id*. The policy separately defines "sexual harassment" as "unwelcome sexual advances; requests for sexual favors; and other inappropriate verbal, written, graphic or physical conduct of a sexual nature when" one of a series of other criteria are met, including that "[s]uch conduct is sufficiently severe, persistent or pervasive that it has the purpose or effect of substantially interfering with the student's school performance or creating an intimidating, hostile or offensive educational environment." *Id*.

23. O.T. testified that after the sexual encounter with Ryan Kline, her friends at OVHS "stopped talking to me, stopped looking at me, making eye contact with me, waving at me, saying hello, inviting me to hang out, inviting me to sit at their lunch table." Dep. O.T., p. 117.

24. O.T. testified that when she returned to OVHS on December 3, 2015, she tried to sit down at her usual lunch table, when a girl told her, "I think it's best if you don't sit here" (the "Cafeteria Incident"). Dep. O.T., p. 118.

25. O.T. returned to the program at Adolescent Transitions where she remained until December 15, 2015.

26. On December 16, 2015, O.T. returned to class at OVHS for approximately two weeks. Dep. O.T., p. 253.

27. During her brief return to school in mid-December 2015, O.T. learned that one of the girls on the field hockey team had posted something about O.T. on her social media account. Dep., O.T., pp. 237-240; Dep., A.T., pp. 219-220.

28. Although O.T. never personally saw the post, she learned that it was Sydney Engler ("Engler"), a high school field hockey team member, who had posted on her Tumblr social media page, "I can't believe O.T. [had sex with] a 25-year-old man" (the "Tumblr Post Incident"). Dep., O.T., p. 302; Dep., S. Engler, p. 13.

29. Engler removed that post when one of her friends suggested that she do so. Dep., O.T., p. 302; Dep., S. Engler, p. 15.

30. O.T. contacted Engler, asked her if she posted that content, and told her that she was hurt by it. Dep., S. Engler, p. 15; Dep., O.T., p. 302.

31. Engler testified that she posted it "out of shock," and that she never intended to hurt O.T. Dep, S. Engler, pp. 14-15.

32. O.T. testified that she "never asked the school administration to force those girls to be [her] friend; in that regard, O.T. said that [the school was] supposed to protect me – they didn't do anything – not a single thing." Dep., O.T., pp. 241-242.

33. O.T. testified that she did remember speaking to Mrs. Hunsberger about how O.T. felt about Maddie and what Maddie was doing. Dep., O.T., pp. 244-245.

34. A.T. testified that she had "ongoing discussions with [Ms. Hunsberger] . . .at least once a day for maybe a period of a week or so and expressed that there was just going to be no way that O.T. could go to school." Dep., A.T., p. 180.

35. A.T. testified that she told Ms. Hunsberger "that O.T. is being ostracized and harassed and ridiculed" by being called a "slut" on a regular basis. Dep. A.T. p. 186.

36. According to A.T., Ms. Hunsberger suggested that O.T. enroll in Berks Online. Dep., A.T., p. 18. According to A.T., Ms. Hunsberger refused to acknowledge the word "bullying" or its ramifications. *Id*. at p.190.

37. Ms. Hunsberger testified that she had reported the Tumblr post incident to Principal Stauffer. N.T., Due Process Hearing, K. Hunsberger at 199, Pl. Ex. 6 (ECF 101-6.) She further testified "[a]nd he was working extensively with the field hockey coach at that time to make sure that the girls continued to treat each other with mutual respect and understanding." *Id*. Ms. Hunsberger also met with Principal Stauffer on December 8, 2015 to let him know that O.T. was back in school. *Id*. at p. 201.

38. Ms. Hunsberger testified that the first time A.T. used the word "bullying" with her was January 21, 2016 and she gave three examples: Maddie telling

O.T. that she did not want to continue their friendship, the Get-Well Cards Incident and the Tumblr Post Incident. *Id*. at pp. 257-258.

39. O.T. testified that Ms. Hunsberger told her that she was aware of both sides of the situation and it was not her place to take sides. Dep., O.T., p. 245; Dep., A.T., pp. 138-140.

40. O.T. testified that she believed that all her teachers and the administration knew that Maddie had rejected her, and that Maddie got all of O.T.'s friends to reject her. Dep., O.T., p. 246.

41. Although O.T. was upset that she did not receive the get-well cards in a timely manner, neither O.T. nor A.T. made any complaint about bullying to anyone at OVHS when O.T. did not receive her get-well cards from Coach Cappellano until January of 2016. N.T., Due Process Hearing, T. Cappellano, pp 484-486.

42. O.T. testified that when she returned to OVHS on December 16, 2015, she was "uninvited" to a field hockey teammate's "open invitation" birthday party because she was told by a non-team member that if O.T. attended, it would make everyone at the party "uncomfortable"; the entire field hockey team, with the exception of O.T., attended the party. O.T. felt humiliated by being asked not come to the party (the "Birthday Party Incident"). Because of that, she did not attend the party. Dep., O.T., p. 255.

43. Things people said about O.T.'s private life that she chose to make public because she wanted help, advice and guidance, really hurt O.T.; girls and guys laughed about it; some people thought it was cool; a good thing;

[some] people wouldn't even look at her. Dep., O.T., p. 257; Dep., A.T., pp. 183-184.

44. O.T.'s friend Shannon Lackey told her that taking a vow of silence meant she was acting like a victim. Dep., O.T., p. 258.

45. O.T. testified that she thought no one in the administration at OVHS was willing to change her class schedule or give her preferred seating so she would not have to look at these people. She just had to go and deal with it. Dep., O.T., pp. 257-258.

46. O.T. testified that no administrator came to her and said, "we want to do something about this. We want to find a way to make you feel more comfortable here. Let's do something about the bullying. File a report." Dep., O.T., p. 260.

47. O.T. testified that no one member of the staff ever assured her that anything was being done -- it was "[w]e just want you to know we hear you" and "it won't go unnoticed." Dep., O.T., p. 292.

48. According to O.T., it was not her job to report bullying. She testified that "[i]t was her job to explain what was happening and for [OVSD] to understand." Dep., O.T., p. 263.

49. On December 23, 2015, the OVSD sent A.T. a Permission to Evaluate ("PTE") form. Although A.T. initially was going to consent to the evaluation, she claims she was talked out of it after a conversation with Ms. Hunsberger on January 5, 2016. Ms. Hunsberger instead convinced A.T. to cross out the

request for an Individualized Placement Evaluation ("IEP")[2] and check the box requesting a Section 504 Service Agreement. Ms. Hunsberger also handed forms to A.T. for O.T. to enroll in Berks Online. N.T., Due Process Hearing, A.T., pp 49-56. Pl. Ex. 6 (ECF 101-6.)

50. No one from the OVSD contacted A.T. about having O.T. evaluated between January 5, 2016, when A.T. rejected the PTE and January 29, 2016, when A.T. requested another PTE form. N.T., Due Process Hearing, D. Cambria, pp. 843-845.

51. The OVSD never created a Section 504 Service Agreement for O.T.

52. O.T. testified that because of the anxiety she was experiencing at OVHS, her mother and her agreed that O.T. should not attend OVHS and instead enroll in Berks Online. Because A.T. was concerned about O.T. being alone at home, Ms. Hunsberger arranged for O.T. to take her online courses at the OVSD's administration building, upon the completion of which each day O.T. would assist in the office with light filing. Dep., O.T., 277. During this period, O.T. also took two music classes and a drama class at OVHS and also participated in field hockey club practice with some of the girls whom she believed were harassing her. Dep., O.T., pp. 251-252.

53. On January 4, 2016, O.T. was readmitted to Adolescent Transitions, where she remained through January 18, 2016.

---

[2] An IEP is a written document that is tailored for a particular child's unique needs. 20 U.S.C. § 1414(d). It describes the child's present abilities and challenges, sets measurable goals and methods to measure the child's progress towards those goals, and prescribes services and modifications for the child. Id.; 34 C.F.R. § 300.320(a); see 22 Pa. Code § 14.102(a)(2)(xxvii) (incorporating 34 C.F.R. § 300.320 by reference).

54. On January 18, 2016, O.T. took steps toward another suicide attempt. O.T. was readmitted to the psychiatric unit of LVH where she remained through January 29, 2016.

55. According to O.T., the motivation for her suicidal ideation was "because of the way I felt I was being so humiliated and left out and bullied by the people in my school." Dep., O.T., p. 267.

56. According to O.T., "that (second attempt) was around January 18, and so maybe I wasn't bullied in a couple of weeks but unfortunately that is not enough to heal yourself from that type of thing. Remember, every single thing we've talked about … a text message, something someone said, or threatened or intimidated me, none of that was ever handled by the school. They never interviewed me and never filed a report." Dep., O.T., pp. 268-269.

57. According to the LVH discharge summary, O.T. was admitted after "being bullied by her teammates" with a diagnosis of bipolar disorder. O.T. was viewed as a High Risk for suicide/homicide, based on the following risk factors: "previous attempts, substance abuse, hopelessness, exposure to abuse/neglect, history of impulsive aggression and the loss of recent meaningful relationships." Pl. Ex. 2 (ECF 101-2.)

58. Ms. Hunsberger scheduled an appointment with A.T. for February 9, 2016, at which Principal Stauffer was scheduled to be present. Dep., O.T., pp. 269-270.

59. O.T. testified that she did not make any progress taking Berks Online because the programs were not at her academic level. N.T. Due Process Hearing, O.T., Pl. Ex. 6, pp. 895-897; N.T., Due Process Hearing A.M. Borovik, Pl. Ex. 6., p. 314; N.T., Due Process Hearing, D. Cambria, Pl. Ex. 6, pp. 786-787.

60. Because the Berks Online program was not working for O.T., A.T. spoke with Ms. Cambria on February 1, 2016 about enrolling O.T. in Progressions, an out of district special education placement. Progressions required an IEP and psychiatric evaluation for admittance. Dep. O.T., pp. 269-270.

61. Ms. Hunsberger arranged for O.T. to be evaluated for eligibility for an IEP by a psychologist subcontracted with the OVSD, Michael R. Houck. Ph.D.

62. On February 3, 2016, A.T. completed OVSD's Parent Information Form in anticipation of O.T.'s examination by Dr. Houck. A.T. noted on the Form that O.T. "has a recent onset of bipolar disorder triggered by a traumatic rape in November. Since that incident, she has been ridiculed and ostracized by her peers, resulting in an inability to concentrate in school." Pl. Ex. 4 (ECF 101-4.) A.T. also noted that O.T. endured a traumatic event and does not feel supported by her peers or by her school." *Id.*

63. Ms. Hunsberger cancelled the February 9, 2016 appointment with A.T. Dep., O.T., pp. 270-271.

64. Ms. Ann Marie Borovik replaced Ms. Hunsberger as O.T.'s guidance counselor because A.T. did not think Ms. Hunsberger had "empathy for the whole situation." Dep., O.T., p. 280.

65. O.T. testified that she had told her mother everything Ms. Hunsberger was not doing for her.

66. A.T. testified that she told Assistant Principal McManus about the bullying and that he gave her advice as to how to document the problems.

67. O.T. testified that she did not remember whether had A.T. documented any problems, and that she did not remember having a conversation with her mother in February of 2016 about documenting problems. Dep., O.T., p. 282.

68. According to O.T., she did not document the Cafeteria Incident. Dep., O.T., pp. 118, 283.

69. Following his examination of O.T., Dr. Houck issued an Evaluation Report on February 26, 2016 in which he determined that O.T. "has a disability AND is in need of specifically designed instruction, and therefore IS ELIGIBLE for special education" under IDEA under the Emotional Disturbance category. Pl. Ex. 12, at pp.10-11. (ECF 101-12.) (emphasis in original.)

70. In the Report, Dr. Houck wrote that O.T. "requires emotional supports to help her cope with anxiety and distractibility that impedes her academic progress. She would benefit from a small-group, highly-structured therapeutic setting" with an academic curriculum "at the college preparatory and honors level." *Id*.

71. The OVSD accepted Dr. Houck's Report and created an IEP so that O.T. could be admitted to Progressions. Dep., O.T., p. 287, Pl. Ex.14 (ECF 101-14.)

72. On March 16, 2016, O.T. started Progressions and completed the 2015-2016 school year there on June 8, 2016. Progressions provided services to O.T. in accordance with Dr. Houck's recommendations.

73. On March 27, 2016, the OVSD held an IEP team meeting and offered an IEP with placement in full time emotional support.

74. By May of 2016, O.T. met with the IEP team at Progressions and stated that she wanted to return to the OVSD for school and field hockey.

75. In A Notice of Recommended Educational Placement/Prior Written Notice ("NOREP") dated May 27, 2016, the OVSD proposed that O.T. return to OVHS on August 24, 2016 and that she was "to receive itinerant emotional support services"  "that do address her emotional needs in order for her to be successful academically." Pl. Ex. 13 (ECF 101-13.)

76. The OVSD agreed that the switch from Progressions back to the OVSD was a change in placement. N.T., Due Process Hearing, A.M. Borovik, Pl. Ex. 6, pp. 316-318 (ECF 101-6); N.T. Due Process Hearing, D. Cambria, pp. 788-789.

77. Before issuing the NOREP on May 27, 2016, the OVSD did not reevaluate O.T. and did not conduct an IEP meeting but instead relied on Dr. Houck's February 26, 2016 report. Another IEP meeting was not scheduled until mid-

September, 2016, after school had already begun, for the purpose of deciding what emotional support services O.T. would need.

78. A.T. signed the NOREP, approving the change in placement on June 20, 2016.

79. O.T. subsequently returned to OVHS two weeks early on August 24, 2016 for field hockey practice.

80. When O.T. returned to the OVSD in August, 2016, O.T.'s IEP from Progressions, which required full-time emotional support, was never modified to reflect the change in placement.

81. The OVSD could not accommodate a full-time emotional support program such as the one O.T. received at Progressions. In such a circumstance, "the OVSD implements the out-of-district IEP to the best of [their] ability until a new IEP can be formed under the OVSD's format." N.T., Due Process Hearing, Allysa Wenrich, Pl. Ex. 6 pp. 387, 391-393, 429 (ECF 101-6.); N.T., Due Process Hearing, D. Cambria, pp. 827-829.

82. Prior to a field hockey game against Exeter Township High School ("Exeter") on September 2, 2016, Maddie told Coach Cappellano that she was not comfortable holding hands with O.T. during introductions, and that her parents did not want her to hold hands with O.T. -- so Coach Cappellano moved the girls around to avoid that situation. Dep., T. Cappellano, pp. 51, 70.

83. Although Maddie high-fived all of her teammates, she did not high-five O.T. during introductions at the game. Dep., O.T., at pp. 64-69; Dep., A.T., p. 251 (the "High-Five Incident").

84. As a result, O.T. ran back to the bench, crying. Coach Cappellano testified that she told O.T. that she saw what happened, that it was unacceptable, and would be addressed. Dep., T. Cappellano, p. 49.

85. Coach Cappellano testified that Maddie's failure to do what she was instructed to do by her coach was disrespectful to a teammate and disobedient to her coach. Dep., T. Cappellano, p. 50.

86. According to O.T., OVSD was aware of this incident. Dep., O.T., at p. 289; Dep., A.T., pp. 241-256.

87. According to Plaintiffs, Maddie was not disciplined for failing to high-five O.T. Dep., O.T., at p. 290; Dep., A.T., pp. 251-25.

88. O.T. testified that although Maddie (and some other teammates) were not permitted to start the next game, O.T. did not believe that was an adequate punishment. Dep., O.T., pp. 291-292.

89. O.T. testified that she did not believe Maddie suffered any real consequences because she was not benched. Dep., O.T., p. 103.

90. O.T. testified that she would have felt empowered if Maddie had received consequences that O.T. was aware of; O.T. was honestly not aware that discipline was confidential. Dep., O.T., p. 108.

91. O.T. played the entire game against Exeter on September 2, 2016. Dep., A.T., p. 253.

92. Coach Cappellano testified that O.T. played a "great game." Dep., T. Cappellano, at p. 49; N.T., Due Process Hearing, T. Cappellano, pp. 505-509.

93. A.T. testified that she told Coach Cappellano that O.T. is being bullied "hard and often" and that, based on what she had been told by others, it's Beth Kline, the mother of Maddie who is causing the bullying of O.T. Dep., A.T., p. 257, 259.

94. About a week after, the High-Five Incident, O.T. was sitting in chemistry class. Maddie and Ethan Lavrador, were sitting in front of O.T. A beaker was being passed around. According to O.T., "Maddie just gets it and doesn't even turn around and look at [O.T.]"; and then O.T. was supposed to pass a paper to Maddie but she would not turn around to receive it (the "Beaker Incident"). Dep., O.T., pp. 128-129.

95. O.T. testified that she felt horrible by what she termed the "little stuff" that happened in chemistry class – for example, she would answer a question and get it wrong and Maddie and Ethan Lavrador would look at each other and laugh and whisper. Dep., O.T., pp. 129-130.

96. O.T. testified that Ms. Borovik knew about the issues O.T. was having in her chemistry class and decided that it was time to get the seats changed in the class, which O.T. heard was "going to happen." Dep., O.T., pp. 130- 131; Dep., A.T., pp. 269-271.

97. On September 8, 2016, an IEP meeting was held at OVSD to review O.T.'s re-entry into OVHS school and either affirm or change accommodations for

her emotional support. During that meeting, A.T. complained about O.T. being bullied, but O.T. interrupted her mother, stating, "no Mom, I'm fine." Dep., A.T., p. 265.

98. At the Due Process Hearing, O.T. testified that this statement was not actually true and that the reason she interrupted her mother was because she was afraid of the other students and did not want the bullying to become worse. N.T., Due Process Hearing, O.T. pp. 924-925, Pl. Ex. 6 (ECF 101-6). She also testified that she was scared of other people in the meeting room such as Ms. Cambria and Principal Stauffer. *Id*.

99. In a NOREP dated September 8, 2016, the OVSD noted that O.T. "is an itinerant student eligible for special education services under the identification of Emotional Support. She will participate in the regular curriculum with the use of specially designed instruction in all class settings." Pl. Ex. 15 (ECF 101-15.)

100. O.T. made an oral presentation in English class to a class of "not friendly faces." Despite her fears that she had failed the presentation, O.T. received a good grade. Dep., O.T., pp. 127, 131; Dep., A.T., pp. 285-286.

101. One of O.T.'s [IEP] accommodations at OVHS was to sit in a quiet study hall. Because O.T. was upset that she was stared at by her classmates during her presentation and by the fact that she thought she had failed her presentation, Ms. Borovik arranged for O.T. to relax in study hall.

102. O.T. testified that while she was in study hall, Sydney Gillingham and another girl [associated with Maddie] walked in and laughed between

themselves, while O.T. was huddled over her desk and shaking. Dep., O.T., pp. 132-133 (the "Study Hall Incident").

103. That same day, O.T. wore her headphones in study hall and didn't realize she was late for the field hockey bus. Dep., O.T., pp. 134-136; Dep., A.T., pp. 285-286.

104. Later that day, O.T. passed out on the field hockey bus from an anxiety attack (the "Bus Incident"). Dep., O.T., pp. 135-138; Dep., A.T., pp. 274, 285-286;

105. O.T. testified that she soon realized that having a panic attack did not make the people that hated her, stop hating her. Dep., O.T., p. 141.

106. According to O.T., the next day was the Oley Valley Fair and she did not attend school. Dep., O.T., p. 142. The Oley Valley Fair was held at the fairgrounds and not on school grounds.

107. O.T. felt so alone because Sarah Gladieux posted of pictures of Maddie [on social media] and all those people having fun at the Oley Valley Fair without her. Dep., O.T., pp. 143-145.

108. O.T. took Ativan (which was prescribed after the Bus Incident) with alcohol and walked over to the Oley Valley Fair to meet her friend Samantha. Dep., O.T., pp. 147-149; Dep., A.T., p. 287.

109.  Upon seeing her in an impaired condition, O.T.'s friends removed her from the fairgrounds to school grounds where O.T. fell over and laid on the grass near "the eagle" (the "Oley Valley Fair Incident"). Dep., O.T., pp. 148-

149. O.T.'s actions were captured on camera. Being impaired while on school property is a violation of OVSD policy.

110.  On September 18, 2016, O.T. told her mother about suicidal ideations she was having and A.T. took her to the hospital where she was readmitted to the LVH psychiatric unit. Dep., O.T., p. 152; Dep., A.T., pp. 298-299.

111. O.T. informed the psychiatric unit that she thought she was moving past the incident with Ryan Kline until school resumed in August and "everyone started bullying her, calling her a 'slut.'" Pl. Ex. 3 (ECF 101-3.) LVH recommended that "it is medically necessary for patient to attend Progressions School upon discharge …in order to provide a therapeutic atmosphere which would lessen the effects of her mental illness on her academic performance. If this placement is not provided the chance for patient to decompensate or require a higher level of treatment would be great." *Id*.

112. Dr. Tracy Shank, the Superintendent of OVSD, Principal Stauffer and Special Services Director Cambria came to visit O.T. at the psychiatry ward at LVH to deliver her options for discipline due to her violation of school policy. All three administrators met with O.T. in the psychiatry ward without either of her parents being present. Dep. of T. Shank, p. 29; N.T., Due Process Hearing, T. Shank, pp. 878-879.

113. O.T. testified that she was informed by Dr. Shank that as punishment for the Oley Valley Fair Incident, O.T. was banned from the field hockey team and from school grounds for a year. Dep. O.T., p. 61-63.

114. As additional discipline, Dr. Shank offered O.T. the following options: 1) sending her back to Progressions; 2) sending her to a 45-day Alcohol and Drug interim placement, or 3) suspending her and then seek to expel her.

115. Dr. Shank testified that she was actually bluffing on options 2 and 3 as she had never expelled a student during her seven years as Superintendent and that "under the legal definitions of the law [she] couldn't move on a 45-day placement. [Dr. Shank] can pay for a drug and alcohol. The district cannot place in drug and alcohol." N.T., Due Process Hearing, T. Shank, p. 867, Pl. Ex. 6 (ECF 101-6).

116. On September 28, 2016, while O.T. was still hospitalized, the OVSD issued another NOREP which changed O.T.'s placement from itinerant support back to full time emotional support in a therapeutic school setting. A.T. signed the NOREP after being advised that it was necessary for O.T. to be placed in a therapeutic setting.

117. O.T. testified that since Progressions would not take her back, she decided to dis-enroll from the OVSD on October 13, 2016 and enroll in the Exeter Township School District. O.T. never returned to the OVSD. Dep., O.T., pp. 152-154; Dep., A.T., p. 310.

118. Neither before nor after the IEP meeting on September 8, 2016, did the OVSD perform a functional behavioral assessment on O.T. and have O.T. reevaluated by Dr. Houck. N.T., Due Process Hearing, A.T., p. 91, Pl. Ex. 6 (ECF 101-6); N.T., Due Process Hearing, A.M. Borovik, p. 332, Pl. Ex. 6

(ECF 101-6); N.T., Due Process Hearing, A. Wenrich, pp. 410-411, Pl. Ex. 6
(ECF 101-6).

119. The OVSD never conducted a manifestation determination meeting to
determine whether O.T.'s behavior that led to the disciplinary action was the
result of her disability.

120. All of the District's Administrators (i.e. Superintendent Shank, Principal
Stauffer, and Ms. Cambria), all of O.T.'s Guidance Counselors (i.e. Ms.
Hunsberger and Ms. Borovik), and Ms. Wenrich (O.T.'s Special Education
teacher for the 2016-2017 school year), testified at either the Due Process
Hearing or at their depositions that they were familiar with the IDEA, and
Section 504. N.T. Due Process Hearing, T. Shank, p. 848 Pl. Ex. 6 (EF 101-
6); N.T., Due Process Hearing, M. Stauffer, p. 584; Dep. D. Cambria, p.11;
N.T., Due Process Hearing, K. Hunsberger, p. 181, Pl. Ex. 6 (ECF 101-6);
N.T., Due Process Hearing, A.M. Borovik, p. 281, Pl. Ex. 6 (ECF 101-6);
N.T., Due Process Hearing, A. Wenrich, p. 283, Pl. Ex. 6 (ECF 101-6).

121. Tim Rhoads was the OVSD Athletic Director between November 2015 and
October 2016. He testified that if he had heard that someone was being
bullied it was his role at the time to assist in the investigation and make sure
that someone in administration was aware of it. Dep., T. Rhoads, p. 16.

122. Mr. Rhoads testified that he believed a written report should be issued for
any bullying incident. Dep., T. Rhoads, pp. 17-19.

123. Mr. Rhoads testified that O.T. never told him she was being bullied or
harassed. Dep., T. Rhoads, p. 24.

124. Mr. Rhoads testified that A.T. never complained to him that O.T. was being bullied or harassed, but that A.T. told him about the High-Five Incident. Dep., T. Rhoads, p. 25.

125. Mr. Rhoads testified that Coach Cappellano did not want the girls taking sides for O.T. or Maddie. Dep., T. Rhoads, p. 52.

126. Mr. Rhoads testified that, in his opinion, the events leading up to the point of O.T.'s parents using the word "bullying" were not bullying. Dep., T. Rhoads, p. 59.

127. Coach Cappellano received 14 hours of training at OVSD regarding bullying issues. Dep., T. Cappellano, pp. 36-43, 82.

128. Coach Cappellano testified at her deposition that she never observed O.T. being harassed or bullied. Dep., T. Cappellano, p. 47. However, she also testified at the Due Process Hearing that, in her opinion, the "High-Five Incident" may have constituted bullying. N.T., Due Process Hearing, T. Cappellano, pp. 467-468, and 474.

129. Coach Cappellano testified at the Due Process Hearing that she had many conversations with A.T. about "students who were saying things", but she could not recall if A.T. used specific words like "bullying." N.T., Due Process Hearing, T. Cappellano, p. 486.

130. Coach Cappellano testified that A.T. never reported to her that O.T. was bullied or harassed. Dep., T. Cappellano, p. 68.

131. Coach Cappellano testified that she can recognize when a student has problems – she had one (affected student) who was withdrawn, who would

drop to the ground sobbing uncontrollably, while O.T. did a good job composing herself and making good eye contact. Dep., T. Cappellano, p. 85.

132. Coach Castellano testified that she was trained on the OVSD's anti-bullying and anti-cyberbullying policy every year.

133. Ms. Cambria testified that neither O.T., A.T. nor anyone else ever informed her that O.T. was being bullied in school. Dep., D. Cambria, p. 23.

134. Ms. Cambria also testified, however, that A.T. told her that O.T. "was being bullied across the hockey field. There were parents on the other side of the hockey field who were talking about her. And A.T. saw those parents and knew that they were talking about her. So she felt that she was being bullied across the hockey field." Dep., D. Cambria pp. 26-27.

135. Ms. Cambria heard that O.T. had an anxiety attack on the bus but afterwards was perfectly fine, according to her mother. Dep., D. Cambria, p. 24.

136. All the information Ms. Cambria had to form the basis of her understanding of O.T.'s problems came from A.T., who told her that there was a history of mental illness in the family. Dep., D. Cambria, p. 28.

137. Ms. Cambria testified that during the September 8, 2016 IEP meeting, when A.T. raised the issue of bullying, O.T. admonished her mother and said, "Mom, would you stop it? Stop saying this. It's not as bad as what you're making it sound." Dep., D. Cambria, p. 29.

138. Ms. Cambria testified that A.T. told her about Engler's Tumblr post. Dep., D. Cambria, p. 31.

139. Ms. Cambria testified that she reported the Tumblr incident to Principal Stauffer and Superintendent Shank. *Id*.

140. Ms. Cambria confirmed at the Due Process Hearing that Principal Stauffer knew about O.T.'s discharge report from LVH in December, 2015. N.T., Due Process Hearing, D. Cambria, p. 768.

141. Ms. Cambria also confirmed that she conveyed the concerns expressed by A.T. in the Special Education Parent Intake Form about O.T. being bullied to Principal Stauffer. *Id*. at 773.

142. Ms. Cambria testified that A.T. didn't use the word "bully". She said her daughter didn't have friends because of "what had occurred with the boy." Dep., D. Cambria, p. 36.

143. Ms. Cambria testified that A.T. did not always provide OVSD with all of O.T.'s medical reports by A.T. Dep., D. Cambria, pp. 38, 40.

144. Ms. Cambria testified that none of the medical reports she saw ever mentioned "bullying," and Ms. Cambria felt that nothing (that happened at school) was about bullying but concerned O.T.'s mental health issues. Dep., D. Cambria, pp. 44-45.

145. Ms. Cambria indicated that O.T. needed mental health supports, coping skills, and self-advocacy skills, and that she was academically strong. Dep., D. Cambria, pp. 50-58.

146. Ms. Cambria testified that A.T. never once used the word "bullying" because if there was that problem the response would have been written into the IEP. Dep., D. Cambria, p. 59; N.T., Due Process Hearing, D. Cambria, pp. 796-797

147. Ms. Cambria testified that during the IEP meeting on September 8, 2016, neither O.T. nor A.T. voiced any concerns about bullying or harassment. Ms. Cambria testified that the focus of the meeting was that O.T. needed coping skills when she became "overwhelmed, anxious, frustrated, and annoyed." Dep., D. Cambria, pp. 60- 62; N.T., Due Process Hearing, D. Cambria, p. 838.

148. Ms. Cambria testified that when O.T. was disciplined for being on school premises under the influence of alcohol, we (Mrs. Cambria, et al.) met with her to reassure her that OVSD was not getting rid of her but that she needed discipline (removal from field hockey team and banned from OVSD property for one year), and informed her that if O.T. needed drug and alcohol treatment, Dr. Shank would pay for it. Dep., D. Cambria, pp. 64-72.

149. Ms. Cambria testified that O.T. never used the words bullied or harassed. Dep., D. Cambria, p. 73.

150. Dr. Shank testified at the Due Process Hearing that as Superintendent, she is "responsible for running everything."  N.T., Due Process Hearing, T. Shank p. 849, Pl. Ex. 6, (ECF 101-6).

151. Dr. Shank testified that in the summer of 2015, a wife of one of the school board's members who is friendly with A.T. told Dr. Shank that O.T. was

experimenting with sex and drugs in the summer of 2015 and wanted Dr. Shank to keep an eye on her so that it didn't impede her field hockey or academics. Dep. of T. Shank, p. 12.

152. The District has a policy against bullying and cyberbullying and the gist of it is that, if "we see it, intervene and then report it." Dep. of T. Shank, pp. 22-24.

153. Dr. Shank testified that between 11/15 and 9/16, there were no reports of bullying or cyberbullying of O.T. Dep. of T. Shank, p. 25; N.T., Due Process Hearing, Dr. Shank, pp. 858, 860.

154. With regard to A.T., there were no reports in 2015-2016 because [Dr. Shank] asks who, what, where, how, why, and there were no names or details. Dep. of T. Shank, p. 26; N.T., Due Process Hearing, Dr. Shank, p. 880.

155. Dr. Shank testified that O.T. never informed her that she was being bullied or harassed. She further testified that the first time A.T. used the word "bullying" was at the hospital in September of 2016 when Dr. Shank Principal Stauffer and Special Services Director Cambria came to visit O.T. at the psychiatry ward at LVH to deliver her options for discipline due to her violation of school policy. Dep. of T. Shank, p. 29; N.T., Due Process Hearing, Dr. Shank, pp. 878-879.

156. Dr. Shank testified that she responded to A.T., "[w]hy didn't you call me?" "And I need specifics. I don't have any." Dep. of T. Shank p. 29.

157. [Dr. Shank, et al.] showed the video of O.T. drunk and stumbling on school grounds and O.T. admitted that she had alcohol in her backpack. Dep. of T. Shank, p. 31.

158. Dr. Shank testified that OVSD tried to investigate rumors about O.T. that Ms. Cambria had heard, but no one, including O.T., would talk about it so there was nothing to investigate within the school setting. Dep. of T. Shank, pp. 33-34; N.T., Due Process Hearing, Dr. Shank, pp. 865-868.

159. Dr. Shank testified that she had learned about the High-Five Incident from Mr. Rhoads and Principal Stauffer. Dep. T. Shank p. 36.

160. Dr. Shank testified that there was no investigative report of the High-Five Incident because it simply amounted to a violation of team rules and unsportsmanlike conduct. Dep. of T. Shank, p. 36; N.T., Due Process Hearing, Dr. Shank, p. 856.

161. Dr. Shank testified that she had learned of the Beaker Incident from Principal Stauffer. Dep. of T. Shank 40-41. She testified that Principal Stauffer and Dr. Liskey decided to rearrange all the seats in the class so it would not look like they were changing the seats to accommodate O.T. *Id.* at pp. 40, 41.

162. Dr. Shank testified that the actions of the students in chemistry class toward O.T. were "inappropriate"; but "didn't rise to any other level." Dep. of T. Shank, pp. 41-42; N.T., Due Process Hearing, Dr. Shank, pp. 878- 879.

163. Dr. Shank testified that she investigated the cause of O.T.'s anxiety attack on the bus, specifically speaking to O.T.'s English teacher who had had the

students give presentations, and learned that the kids were not staring at

O.T., but watching her give a presentation for which she earned a 90%.

Dep. of T. Shank, pp. 39-40.

164. Ms. Borovik testified that the District has a bullying/cyberbullying policy

and she has been trained, and retrained, every year. Dep., A.M. Borovik,

pp. 14-16.

165. Ms. Borovik testified that she never witnessed O.T. being bullied or

cyberbullied nor did O.T. ever inform her that she was being bullied or

cyberbullied. Dep., A.M. Borovik, pp. 23-24.

166. Rather, Ms. Borovik testified that A.T. informed her around February 10,

2016 that O.T. was being "tormented" and A.T. herself was being

"harassed." Dep., A.M. Borovik, pp. 23-24, 42.

167. Ms. Borovik testified that the next day she reported A.T.'s contention that

O.T. was being tormented to Principal Stauffer. Id. She testified that she did

not know what Principal Stauffer did with the information. *Id.*

168. Ms. Borovik testified A.T. never said that O.T. was being bullied, nor had

anyone else. Dep., A.M. Borovik, p. 25.

169. Ms. Borovik testified that she was not consulted and did not hear anything

about the High-Five Incident; did not hear anything about the Tumblr Post

Incident; was unaware of Tumblr; but had heard about the Beaker Incident.

Dep., A.M. Borovik, p. 30.

170. Ms. Borovik testified that she reported the "Beaker Incident" to Principal Stauffer and that he conducted an investigation. *Id.* at 32. She did not know if he filed a written report. *Id.*

171. Ms. Borovik testified that although she was not present, she had heard that Maddie and Ethan Lavrador were the kids in the chemistry class that O.T. had problems getting papers and beakers from; and she knew that Maddie was involved in the "High-Five Incident." Dep., A.M. Borovik, p. 31.

172. Ms. Borovik testified that although she had conversations with O.T. after February of 2016, O.T. never used the word "bullying" nor the word "harassment." Rather O.T. talked about her post-secondary plans, field hockey; getting along with her mother; anxiety, coping strategies, Berks-On Line, Progressions; NCAA eligibility; and classes to take. Dep., A.M. Borovik, pp. 34-35.

173. Ms. Borovik testified that she spoke often with O.T. about how she was being tormented by her friends; means of support for O.T.; and making a change in chemistry class. Dep., A.M. Borovik, p. 36.

174. With regard to placing O.T., Maddie and Ethan Lavrador in the same chemistry class, Ms. Borovik testified that the class schedule is computer-generated, O.T. needed AP Chemistry, as did the others, and there had been no previous issues between, O.T. Maddie and Ethan that had been brought to her attention. Dep., A.M. Borovik, p. 46.

175. Ms. Borovik testified that she had firsthand knowledge that O.T. was in possession of alcohol on school grounds because O.T. had called Ms.

Borovik and asked where the boundary line was between the fairgrounds and the school grounds. Dep., A.M. Borovik, p. 70.

176. Principal Stauffer testified that although he remembered O.T., he did not recall any issues with her physical or mental health nor any problems with drugs or alcohol. Dep., M. Stauffer, p. 16.

177. Principal Stauffer testified that the OVSD has a bullying and cyberbullying policy and he was trained on these policies during in-service days. Dep., M. Stauffer, pp. 18-19; N.T., Due Process Hearing, M. Stauffer, p. 586.

178. Principal Stauffer testified that If he learned that someone was being cyberbullied/bullied, he would immediately investigate by interviewing the victim and the accused and document his meetings and keep it in a file in his office. Dep., M. Stauffer, pp. 20-21; N.T., Due Process Hearing, M. Stauffer, p. 586.

179. Principal Stauffer testified that there was no investigation of O.T. being bullied or cyberbullied because there were no complaints of bullying or cyberbullying. Dep., M. Stauffer, p. 22; N.T., Due Process Hearing, M. Stauffer, pp. 588-589; 591 (Tumblr post was not school-related.)

180.  Principal Stauffer testified that O.T. never told him that she was being bullied. He also testified that during the IEP meeting on September 8, 2016, that A.T. said that she believed some parents were acting in a certain way during a hockey game, and O.T. jumped in and cut her off and said, "no Mom I'm fine." Dep., M. Stauffer, pp. 27-28, 40; N.T., Due Process Hearing,

T. Rhoads, pp. 713-714; N.T., Due Process Hearing, M. Stauffer, pp. 643-644.

181. Principal Stauffer testified that no one, including Ms. Hunsberger, Ms. Borovik, Coach Cappellano, or Mr. Rhoads, ever informed him that O.T. was being bullied, cyberbullied or harassed. Dep., M. Stauffer, pp. 29-31; N.T., Due Process Hearing, T. Rhoads, p. 720.

182. Principal Stauffer testified that Mr. Rhoads did inform him that O.T.'s parents were very upset at the September 2, 2016 field hockey game against Exeter and wanted to know what discipline Maddie would receive. Dep., M. Stauffer, p. 32; N.T., Due Process Hearing, T. Rhoads, p. 715. Principal Stauffer testified that he did not investigate the incident. Dep., M. Stauffer 32.

183. Principal Stauffer testified that he had heard about the Beaker Incident with Maddie and Ethan, but he thought Ethan was the culprit -- not Maddie. Dep., M. Stauffer, p. 33; N.T., Due Process Hearing, M. Stauffer, p. 600.

184. Principal Stauffer testified that he also heard about the Bus Incident but did not investigate because O.T. was medically cleared to play field hockey afterwards and her mother approved. Dep., M. Stauffer, pp. 33-35; N.T., Due Process Hearing T. Rhoads, pp. 745-746.

185. Principal Stauffer testified that he did not hear about the pre-season games in which Maddie was not high-fiving O.T., but he did hear about the Tumblr Post Incident prior to the due process hearing. Dep., M. Stauffer, pp. 35-36; N.T., Due Process Hearing, T. Rhoads, p. 734.

186. Principal Stauffer testified that he was made aware of the Oley Valley Fair Incident and investigated it by speaking to some students who gave him a statement about it. Dep., M. Stauffer, p. 41.

187. Principal Stauffer testified that he did not conduct an investigation into any name-calling of O.T. as a "slut". Dep., M. Stauffer, p. 46.

188. Principal Stauffer testified at the Due Process Hearing that he reviewed the findings in Dr. Houck's Special Education Evaluation Report of February 26, 2016 but did not investigate any of the Findings because in Principal Stauffer's opinion the Findings sounded more like social anxiety than bullying. N.T., Due Process Hearing, M. Stauffer, pp. 594-595. He further testified that he did not discuss the Findings with Dr. Houck. *Id*. at 595.

189. Principal Stauffer testified that despite reading Dr. Houck's findings that there were problems between O.T. and her peers, he did not think it was appropriate to bring O.T. or her peers into his office for a discussion. *Id*. at 601. Principal Stauffer testified that he did not have an answer as to why he did not believe it was appropriate. *Id*.

190. Principal Stauffer testified that during the visit to the LVH to discuss options for O.T.'s discipline after the Oley Valley Fair Incident, O.T. never mentioned bullying or being ostracized; rather she said she had anxiety. Dep., M. Stauffer, p. 61.

191. Principal Stauffer testified that he did not recall O.T.'s parents telling him that O.T. was being bullied, harassed or ostracized. Dep., M. Stauffer, p. 62.;

192.  Principal Stauffer testified that he did not notice anything in O.T.'s IEP
about bullying, and it indicated that there were "no parental concerns at this
time." He testified that he did not know whether A.T. signed a NOREP
document which would have confirmed her agreement with the contents of
the IEP. Dep., M. Stauffer, pp. 71-72, 77.

193. Principal Stauffer testified that a medical report with a reference to being
called a "liar" would not necessarily trigger an investigation for bullying
under District Policies 248 and 252. Dep., M. Stauffer, p. 79.

194. Neither Principal Stauffer nor any other administrator at OVHS
initiated any type of formal investigation or wrote any type of formal report
into any of O.T.'s claims of peer harassment and whether any harassment
had an effect on O.T.'s ability to function in OVHS. Dep., M. Stauffer, p.
81.

195. O.T.'s music teacher, Ms. Lynch testified that O.T. was not in class the
entire school year of 2015-2016 and that O.T. was a phenomenal, extremely
intelligent student, who was "very, very musical." N.T., Due Process
Hearing, K. Lynch, p. 562.

196.  Ms. Lynch testified that she was aware of O.T.'s hospitalization but was
not aware of bullying allegations. N.T., Due Process Hearing, K. Lynch, p.
564.

197.  Ms. Lynch testified that at one time O.T. came to the music room and told
her that she was at a party and that an older boy took advantage of her. She

testified that she was also aware that, days later, O.T. attempted to take her

own life. N.T., Due Process Hearing, N.T., p. 565.

198.  Ms. Lynch testified that she did not report the sexual relations to anybody

because, at that point, the police had become involved, there were medical

professionals involved and it was after her hospitalization, and her parents

were involved. Ms. Lynch testified that she believed O.T. was a kid who

needed somebody to talk to and needed to vent a little bit and I was there.

N.T., Due Process Hearing, K. Lynch, p. 567.

199. Ms. Lynch was not speaking of bullying – O.T.'s words were that the boy

"took advantage"; O.T. did not go into detail and no other student came to

talk to me about O.T. and bullying. No other teacher reported anything

about O.T. and bullying. Ms. Lynch never witnessed bullying. N.T., Due

Process Hearing, K. Lynch, p. 569.

200. Ms. Lynch testified that she received training on OVSD's anti-bullying

policy. N.T., Due Process Hearing, K. Lynch, p. 575.

201. Ms. Lynch testified that O.T. never raised any concerns about bullying with

her and that she did not believe there was any issue with O.T. being bullied.

She testified that the time that she spent with O.T. was spent making music

and enjoying one of O.T.'s greatest talents. N.T., Due Process Hearing, K.

Lynch, p. 579.

202.  Aaron Magaro, the Band Director at OVHS, testified that O.T. never told

him about any difficulties she was having with other students. N.T., Due

Process Hearing, A. Magaro, p. 550. He testified that O.T. did not

disengage and that he never noticed that she was "not herself." N.T., Due
Process Hearing, A. Magaro, p. 551.

203. Mr. Magaro testified that neither O.T. nor any faculty member or
administrator came to him and asked him to watch out for bullying of O.T. or
advised him about any specific incidents involving O.T. N.T., Due Process
Hearing, N.T., A. Magaro, p. 555.

204.  Mr. Magaro testified that he was not aware that parents or students were
targeting O.T. N.T., Due Process Hearing, A. Magaro, p. 559.

205.  Mr. Coldren testified that O.T. came to him after class and told him that
she had been at a party recently and there was alcohol involved and she
had had sexual relations with a 25-year-old in the house. Mr. Coldren
testified that he did not know why she chose to tell him, as he was not very
close with her. N.T., Due Process Hearing, T. Coldren, p. 530.

206.  Mr. Coldren testified that he told O.T. that he would report the incident to
Child Line. N.T., Due Process Hearing, T. Coldren, p. 531.

207. According to O.T., a summary of the specific harassing events is as
follows: "chemistry class when Maddie wouldn't hand O.T. a beaker; the
September 2, 2016 game when Maddie wouldn't high-five O.T.; the
cafeteria incident when a girl agreed that O.T. should sit elsewhere; the `un-
invite' to the birthday party; the delayed get-well cards; and the Tumblr
post." Dep., O.T., p. 292.

208. O.T. testified that "I used to have a lot of friends. And like in a matter of
like a couple weeks, which turned into years, like these people completely

wrote me off as if I was some type of --you know, as if I were the bad guy.

Dep., O.T. p. 144. She further testified that, "[a]ll I know is that slowly at first

and then within a matter of months the majority of the school population

started ostracizing me, and I don't know why that happened because I don't

think I did anything that was wrong." Dep., O.T. p. 298.

209. O.T. also indicated that the following constituted bullying: "dozens of other

times [Maddie] didn't high-five me and ostracized me at practice; like over

100 people in school stopped talking to me, probably more; I never had a

partner in class anymore; I would have to work by myself; a lot of the

bullying that happened wasn't said to my face, it was said behind my back

by people I thought were my friends to people that could have been my

friends if they hadn't been told those things that weren't true about me."

Dep., O.T., p. 297; Dep., A.T., pp. 136, 144-147.

## **DISCUSSION**

Title IX mandates that no individual, on the basis of sex, "be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any

education program or activity receiving federal financial assistance." *Davis v. Monroe*

*Cty. Bd. of Educ.*, 526 U.S. 629, 638 (1999). In *Davis*, the Supreme Court held that Title

IX permits a plaintiff to recover damages from a federally funded educational institution

for certain cases of student-on-student sexual harassment. However, this private cause

of action against a school for its response to student-on-student sexual harassment is a

"high standard" that applies only "in certain limited circumstances." *Davis*, 526 U.S. at

643. The school is "properly held liable in damages only where [it is] deliberately

indifferent to sexual harassment, of which [it] has actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id*. at 650. *See also Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 n.99 (3d Cir. 2018).

In order to hold the OVSD liable for its own conduct in the instance of student-on-student harassment, the Plaintiffs must establish that: (1) the defendant receives federal funds; (2) sexual harassment occurred; (3) the harassment was "so severe, pervasive, and objectively offensive that it [could] be said to [have] deprive[d] the victims of access to the educational opportunities or benefits provided by the school;" (4) the harassment occurred under "circumstances wherein the recipient exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red (5) the funding recipient had "actual knowledge" of the harassment; and (6) the funding recipient was "deliberately indifferent" to the harassment. *Davis*, 526 U.S. at 645, 650.

The Supreme Court has instructed that "[w]hether gender [or race]-oriented conduct rises to the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectations, and relationships . . . ." *Davis*, 526 U.S. at 651 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). These circumstances include, but are not limited to, "the ages of the harasser and the victim and the number of individuals involved." *Id*. Furthermore, the Supreme Court has remarked that courts evaluating Title IX claims "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults" since at school they "often engage in insults,

banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Id*. "Damages are not available for simple acts of teasing and name-calling among school children . . . even where these comments target differences in [sex]." *Id*.

With regard to the first factor, there is no dispute that the OVSD was federally funded at the time the incidents which are the subject of the Amended Complaint took place.

With regard to the second factor[3], the OVSD argues that with the exception of O.T.'s peers calling her a slut and the Tumblr Incident, the other incidents were not sexual in nature. However, this Court has recently held that "[w]hen a sexual assault triggers a course of harassment, the total course of events can be considered sexual harassment." *Goodwin v. Pennridge School District*, 389 F. Supp. 3d 304 (E.D. Pa. 2019); *C.S. v. Southern Columbia Sch. Dist.*, 2013 WL 2371413, at *9 (M.D. Pa. May 21, 2013) ("in light of the sexual assault, we cannot say as a matter of law that those contacts and threats from the perpetrators' friends do not amount to sexual harassment"). *See also, Doe v. East Haven Bd. of Educ.*, 200 Fed. App'x 46, 48 (2d Cir. 2006). Therefore, a reasonable jury could conclude that the general harassment and the specific incidents detailed, *supra*, although not directly related to O.T.'s gender, were nevertheless sexual in nature since none of them would have occurred in the absence of the alleged sexual assault on O.T.

---

[3] It should be noted that bullying is not the same as sexual harassment. "Gender-based or sexual harassment require a component directly related to one's gender. Bullying, on the other hand, is a more generic term for abuse or intimidation, but has no required relationship to one's gender." *Butler v. Mountain View Sch. Dist.*, 2013 WL 4520839, at *7 (M.D. Pa. Aug. 26, 2013); see also *Lansberry v. Altoona Area School District*, 318 F. Supp. 3d 739, 749 (W.D. Pa. 2018).

To determine whether alleged harassment is severe or pervasive[4] for purposes of the third factor," the "overall scenario" must be considered. *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 276 (3d Cir. 2001). However, a "single isolated incident" of sufficient severity can "create a hostile work environment." *Castleberry*, 863 F. 3d at 264-265; *see also* Dep't of Educ. OCR, "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" (Jan. 2001) ("2001 Guidance") at 6 ("a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment"). To be severe, pervasive and objectively offensive, the behavior must be serious enough to have a "systemic effect" of denying equal access to an education. *Davis*, 526 U.S. at 652.

Looking to the "constellation of surrounding circumstances," the Court notes that Plaintiff was a 15-year old high school honors student and star athlete at the time she claimed she was raped at a party by the 25-year old brother of one of her friends and field hockey teammates. When she tried to return to OVHS following the sexual assault, O.T. was almost immediately ostracized by Maddie, friends O.T. shared with Maddie, field hockey teammates and many other students. In the words of O.T.,

> my best friend for a pretty long time, all of a sudden like someone who I really, really trusted tell[s] me that this was my fault; and I was going to get this guy in trouble; and that I shouldn't have said anything; and I shouldn't have even done it in the first place and it was my fault for getting drunk;

---

[4] Our Court of Appeals has recently stated that the correct standard is severe **or** pervasive rather than severe **and** pervasive. *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 n.99 (3d Cir. 2018) citing *Castleberry v. STI Grp., 863 F.3d 259, 264-65 (3d Cir. 2017)*.

> I had Sydney Gillingham who would sometimes talk to me but if Maddie was around she would completely ignore me.

Dep., O.T., p. 237. O.T. continued:

> I used to have a lot of friends. And like in a matter of like a couple weeks, which turned into years, like these people completely wrote me off as if I was some type of --you know, as if I were the bad guy. Dep. O.T. p. 144. She further testified that, "[a]l I know is that slowly at first and then within a matter of months the majority of the school population started ostracizing me, and I don't know why that happened because I don't think I did anything that was wrong." Dep. O.T. p. 298. She testified that her friends at OVHS "stopped talking to me, stopped looking at me, making eye contact with me, waving at me, saying hello, inviting me to hang out, inviting me to sit at their lunch table.

Dep. O.T., p. 117. O.T. further testified:

> that like over 100 people in school stopped talking to me, probably more; I never had a partner in class anymore; I would have to work by myself; a lot of the bullying that happened wasn't said to my face, it was said behind my back by people I thought were my friends to people that could have been my friends if they hadn't been told those things that weren't true about me.

Dep., O.T., p. 297.

O.T. and A.T. also testified that O.T. was called a "slut" by her peers on a regular basis. O.T. informed the psychiatric unit at LVS that when she resumed attending OVHS in August, 2016, "everyone started bullying her, calling her a "slut." Pl. Ex. C (ECF 101-3.)

O.T. testified that her ostracization also consisted of specific incidents including the Beaker Incident, High-Five Incident, the Birthday Party Incident, the Cafeteria Incident, the Get-Well Cards Incident and the Tumblr Incident.  The Court agrees with

the OVSD that these specific incidents, if considered individually and if only one of them would have occurred, could be viewed as isolated and objectively mild. Indeed, the Court notes that there is no evidence in this case of many of the more common forms of sexual harassment that courts have found to be severe or pervasive in Title IX cases, including the lack of any physical abuse or threats against O.T. and the lack of any incidents of groping or stalking of O.T. by any student at OVHS.[5]  However, the cumulative effect of these incidents turned this into a "severe and pervasive" situation.

The Court again stresses that in determining whether the alleged harassment is "severe or pervasive" the "constellation of surrounding circumstances, expectations and relationships" and "overall scenario" must be considered. *Davis*, 526 U.S. at 651; *Abramson*, 260 F.3d at 276. The "overall scenario" of ostracization by her peers on a regular basis resulted in O.T., who excelled in academics and field hockey, attending OVHS for only 20 days, making one attempt on her life, having to be hospitalized in the psychiatric unit of LVH on three separate occasions and having to take online classes and enroll in an out of district special education placement. Clearly, it is undisputed that after the sexual assault, O.T. was only able to attend OVHS for five days during her sophomore year and another 15 days during her junior year, before she transferred to Exeter. Were a reasonable jury to credit and find O.T.'s testimony to be believable, that jury could find that O.T. suffered from severe or pervasive sexual harassment that

---

[5] Indeed, in *Davis*, the Supreme Court concluded that alleged constant verbal harassment over a five-month period by a male 5th grade student to the Petitioner's daughter, a female classmate, including remarks such as " 'I want to get in bed with you' " and " 'I want to feel your boobs'" and objectively offensive acts by the male student of "purportedly plac[ing] a door stop in his pants and proceed[ing] to act in a sexually suggestive manner toward [the Petitioner's daughter] during physical education class" and "allegedly rubb[ing] his body against [the Petitioner's daughter] in the school hallway in what [Petitioner's daughter] considered a sexually suggestive manner", all of which finally ended when the male student was "charged with, and pleaded guilty to, sexual battery," satisfied the Court's severe, pervasive and objectively offensive standard. *Davis*, 526 U.S. at 634, 653.

ended up depriving her of the educational opportunities or benefits to be provided by OVHS.

Turning to the fourth Davis factor, with the exception of the Tumblr Post Incident, the Court finds that there is evidence in the record from which a reasonable jury could conclude that all of the generalized harassment and the other specific instances of harassment all occurred under "circumstances wherein the recipient exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]," *Davis*, 526 U.S. at 652.

In order to recover damages from OVSD under Title IX, Plaintiffs must also demonstrate that an official or appropriate person with the ultimate authority to address the discrimination had actual knowledge of the discrimination and failed to adequately respond, showing a deliberate indifference to discrimination. *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 290, (1998). "An educational institution has 'actual knowledge' if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." *Bostic v. Smyrna School District*, 418 F.3d 355, 361 (3d Cir.2005).

 "An 'appropriate person' ... is, at minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser*, 524 U.S. at 290. Whether a person is an "appropriate person" does not simply depend on his job title. Rather, designation under Title IX as an "appropriate person" depends on the individual's actual authority to end the discrimination. *Warren ex rel. Good v. Reading School Dist.*, 278 F.3d 163, 172 (3d Cir.2002) (holding a principal was an "appropriate

person" based on testimony "she was in charge of every aspect of daily operations ... including supervision and discipline of the teachers of the school.")

Principal Stauffer testified that neither O.T. nor A.T. ever directly complained to him that O.T. was being harassed at any time at OVHS. Yet, there is other testimony that reveals Principal Stauffer nevertheless actually knew of O.T.'s emotionally fragile state and that incidents of harassment were significant stressors to her condition. For instance, A.T. testified that Principal Stauffer called her on the evening of November 14, 2015 to let her know that he was "aware of what had happened at the Kline party and that OVHS would support O.T. academically." Dep., A.T., pp. 122-123. Ms. Hunsberger, O.T.'s first guidance counselor, testified that she shared O.T.'s discharge summary from LVH from December, 2015 with Principal Stauffer, Assistant Principal McManus and Director of Special Services Cambria. N.T. Due Process Hearing, K. Hunsberger, pp. 191-192. Ms. Cambria also confirmed at the Due Process Hearing that Principal Stauffer knew about O.T.'s discharge report from LVH in December 2015. N.T., Due Process Hearing, D. Cambria at 768. Ms. Cambria also confirmed that she conveyed the concerns expressed by A.T. in the Special Education Parent Intake Form about O.T. being harassed to Principal Stauffer. *Id*. at 773. Ms. Borovik also testified that she reported A.T.'s contention that O.T. was being tormented to Principal Stauffer. Dep. A.M. Borovik, pp. 23-24, 42.

Principal Stauffer contradicted this testimony when he testified that although he remembered O.T., he did not recall any issues with her physical or mental health nor any problems with drugs or alcohol. Dep. M. Stauffer, p. 16. He also contradicted his own testimony when he testified that no one, including Ms. Hunsberger, Ms. Borovik,

Coach Cappellano, or Mr. Rhoads, ever informed him that O.T. was being bullied, cyberbullied or harassed. Dep., M. Stauffer, pp. 29-31; N.T., Due Process Hearing, T. Rhoads, p. 720. Principal Stauffer also testified that he was aware of the High-Five Incident, the Beaker Incident, the Bus Incident and the Oley Valley Fair Incident. Dep., M. Stauffer, pp. 32, 33, 33-35, 41; N.T., Due Process Hearing, M. Stauffer, p. 600.

Principal Stauffer testified at the Due Process Hearing that he reviewed the findings in Dr. Houck's Special Education Evaluation Report of March 2016 but did not investigate any of the Findings because in Principal Stauffer's personal opinion Dr. Houck's Findings sounded more to him like social anxiety than bullying. N.T., Due Process Hearing, M. Stauffer, pp. 594-595. He further testified that he did not discuss the Findings with Dr. Houck. *Id*. at 595.

Finally, and perhaps most alarming, Principal Stauffer testified that despite reading Dr. Houck's Findings that there were problems between O.T. and her peers, he did not think it was appropriate to bring O.T. or her peers into his office for a discussion. *Id*. at 601. And Principal Stauffer testified that he did not have an answer as to why he did not believe it was appropriate. *Id*.

Based on this testimony there is at the very least a genuine issue of material fact as to whether Principal Stauffer, clearly an "appropriate person" under *Gebser* and *Warren*, had actual knowledge of any harassment and the danger that such harassment posed to O.T. while a student at OVHS from November, 2015 through October, 2016.

Finally, the OVSD may not be liable for damages under Title IX unless its deliberate indifference makes a student vulnerable to or causes them to undergo harassment. *Davis,* 526 U.S. at 644–45. Deliberate indifference to acts of peer sexual

harassment arises only where the school district's response or lack of response to the harassment is clearly unreasonable in light of the known circumstances. *Id*. at 648. "[A] Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference. *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 257 (2009) citing *Gebser* 524 U.S. at 290.

At the very least, a reasonable jury could find that Principal Stauffer exhibited deliberate indifference to the harassment of O.T. by her peers when he testified that despite reading Dr. Houck's findings that there were problems between O.T. and her peers, he did not think it was appropriate to bring O.T. or her peers into his office for a discussion and that he did not have an answer as to why he did not believe it was appropriate. N.T., Due Process Hearing, M. Stauffer, p. 601.

In considering whether the lack of actions by Principal Stauffer and other administrators were reasonable, a reasonable jury might also wish to consider that for almost one year no appropriate administer at OVSD conducted an investigation into the harassment of O.T., but three administrators rushed to inform O.T. outside the presence of her parents while she was still in the psychiatric unit at LVH about her punishment for being dropped off by her friends on OVHS property while in an impaired state.

The Defendants motion for summary judgment on Count One of the Amended Complaint is denied.

In Count II of their Amended Complaint, Plaintiffs contend that the OVSD violated section 504 of the RA and Title II of the ADA.

At this point, some background information is helpful. The IDEA ensures that children with disabilities have access to a FAPE. 20 U.S.C. § 1412(a)(1). As part of the obligation to provide a FAPE, school districts receiving federal funding must design and implement an IEP for each student with a disability. 20 U.S.C. § 1414(d)(2)(A). The IEP "consists of, *inter alia,* a specific statement of a student's present abilities, goals for improvement, services designed to meet those goals, and a timetable for reaching the goals via the services." *Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 755 (3d Cir.1995). The IEP "must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *Mary T. v. Sch. Dist. of Phila.,* 575 F.3d 235, 240 (3d Cir.2009) (*quoting Shore Reg'l High Sch. Bd. of Educ. v. P.S.,* 381 F.3d 194, 198 (3d Cir.2004)) (internal quotations omitted).

Section 504 of the RA states:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ....

29 U.S.C. § 794(a)

Title II of the ADA states that:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

The parties agree the standard under both of these statutes requires Plaintiffs to show O.T. "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of her disability." *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). In addition, in order to recover compensatory damages under the RA and the ADA, a plaintiff must show intentional discrimination on the part of the defendants. *S.H. ex rel. Durrell v. Lower Merion School Dist.*, 729 F. 3d 248, 262 (3d Cir. 2013). Our Court of Appeals has held that plaintiff can satisfy the intentional discrimination standard by showing that the defendant acted with deliberate indifference, To satisfy the deliberate indifference standard, a plaintiff must present evidence that shows both: (1) knowledge that a federally protected right is substantially likely to be violated, and (2) failure to act despite that likelihood. *Id*. at 265. The Court of Appeals also noted that "deliberate indifference must be a deliberate choice, rather than negligence or bureaucratic inaction." *Id*. at 263.

Here, a reasonable jury could find that the OVSD's decision on May 27, 2016 (NOREP) to significantly change O.T.'s placement and IEP from one of full emotional support (which was recommended by Dr. Houck and which O.T. received at Progressions) to one of itinerant emotional support (which was the most support available at OVHS) without having O.T. reevaluated by Dr. Houck and without having O.T.'s multi-disciplinary IEP team confer and discuss the ramifications **before** O.T. was permitted to resume her education at OVHS was not reasonably calculated to enable O.T. to receive meaningful educational benefits. Section 504 of the RA specifically requires that an evaluation be made before any significant change in placement takes

place. 34 C.F.R. § 104.35(a). ("A recipient that operates a public elementary or secondary education program or activity shall conduct an evaluation ….of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education **and any subsequent significant change in placement**.")(emphasis added.) 34 C.F.R. 300.324(b)(1)(ii)(D) ("Each public agency must ensure that. . . the IEP team revises the IEP, as appropriate to address [t]he child's anticipated needs.")

The IEP that resulted from the September 8, 2016 IEP meeting also did not provide O.T. wit the full emotional support recommended by Dr. Houck and did not contain any provisions dealing with the harassment of O.T. Although A.T. testified that when she tried to raise the issue of bullying or harassment at the meeting, O.T. stopped her, O.T. also testified that this statement was not actually true and that the reason she interrupted her mother was because she was afraid of the other students and did not want the bullying to become worse. N.T., Due Process Hearing, O.T. pp. 924-925, Pl. Ex. 6 (ECF 101-6). At the very least, this is an issue of material fact for a jury. As it turned out, as a result of the new IEP, O.T. ended up back in the psychiatric unit of the LVH for a third time and ultimately had to withdraw from the OVSD.

The Court is aware that both O.T. and A.T. wanted O.T. to return to OVHS in the fall of 2016 and that A.T. signed the May 27, 2016 NOREP on June 20, 2016. However, a school district still has a duty to offer appropriate placement regardless of parents' desires. *M.C. on Behalf of J.C. v. Central Reg. Sch. Dist.*, 81 F. 3d 389, 397 (3d Cir. 1996)**.** ("[I]t is the responsibility of the child's teachers, therapists, and administrators—

and of the multi-disciplinary team that annually evaluates the student's progress—to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly."**)** And according to Dr. Houck's latest evaluation report from February 26, 2016, O.T. still needed to be placed in a "small-group, highly structured therapeutic setting "with an "academic curriculum "at the college preparatory and honors level." The OVSD clearly could not, however, accommodate or provide a full-time emotional support setting. N.T., Due Process Hearing, Allysa Wenrich, Pl. Ex. 6 pp. 387, 391-393, 429 (ECF 101-6.); N.T., Due Process Hearing, D. Cambria, pp. 827-829.

The OVSD argues that the evidence reveals that its actions were at worst the result of negligence or bureaucratic inaction and not deliberate indifference. The Court does not agree. Given the admitted knowledge by the OVSD administrators of the IDEA and Section 504 of the Rehabilitation Act, a reasonable jury could find that the OVSD's failure to have O.T. reevaluated by Dr. Houck and failure to convene the O.T's team before changing O.T.'s placement from full-time emotional to itinerant emotional and its concomitant failure to have an updated IEP in place at the start of O.T.'s 2016-2017 academic year amounted to a failure to act despite knowledge of the likelihood of a violation of a federally protected right.

A reasonable jury is also entitled to contrast the OVSD's inaction in having O.T. reevaluated and having a revised IEP in place with the OVSD's apparent clear desire to mete out discipline to O.T. while she was still confined to the psychiatric unit of LVH and her parents waited outside. Even more compelling and shocking is Dr. Shank's testimony at the Due Process Hearing that she was actually bluffing on options 2 and 3 as she had never expelled a student during her seven years as Superintendent and that

she had no legal authority for insisting on a 45-day Alcohol and Drug Placement N.T., Due Process Hearing, T. Shank, p. 867, Pl. Ex. 6 (ECF 101-6). In addition, the options Dr. Shank offered required the OVSD to first conduct a Manifestation Meeting pursuant to 20 U.S.C. 1415(k)(1). However, the record indicates that the OVSD failed to do that.

For the foregoing reasons, the OVSD's motion for summary judgment is denied.